# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

PATRICIA A. SIX,

    Plaintiff,

vs.

Civil Action 2:18-cv-01639
Judge James L. Graham
Chief Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF
SOCIAL SECURITY,

    Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Patricia A. Six, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the Chief United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 18), and the administrative record (ECF No. 7). Plaintiff did not file a Reply. For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

# I. BACKGROUND

Plaintiff applied for both disability insurance benefits and supplemental security income in May 2015, alleging disability beginning April 1, 2013.[1] (R. at 227–28, 229–34, 254.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 175–77.) Administrative Law Judge Thomas Wang ("ALJ") held a hearing on November 17, 2017, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 42–56.) A vocational expert also appeared and testified at the hearing. (R. at 56–60.) On May 30, 2018, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 10–22.) On October 16, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then timely commenced the instant action.

# II. HEARING TESTIMONY[2]

## A. <u>Plaintiff's Testimony</u>

At the administrative hearing, Plaintiff testified that she is unable to work due to several ailments, including fibromyalgia, which causes pain "all over," but affects her knees and back the worst; neck pain that pinches on her nerves and affects her arms; IBS, along with stomach discomfort; interstitial cystitis, causing bladder pain; vulvar dystrophy, made worse by walking; and headaches. (R. at 42–43.) In connection with the vulvar dystrophy, Plaintiff testified that "[t]he skin at the end of the vagina to the rectum will split open and it will stay raw and open . . .

---

[1] Plaintiff amended her alleged onset date of disability to April 2, 2015. (R. at 40, 250.)
[2] The Undersigned limits the analysis of the evidence and the administrative decision to the issues raised in the Statement of Errors.

on a pretty constant basis . . . at least 20 days [per month]." (R. at 43.) Plaintiff testified that walking after "a few seconds" she can feel the discomfort. (R. at 54.) Plaintiff noted that she also has been diagnosed with idiopathic hypersomnia. (R. at 50.)

There was no testimony taken as to Plaintiff's alleged right ankle impairment.

### B. <u>Vocational Expert Testimony</u>

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past relevant work includes a fast food worker, a light, unskilled job; and a home health aide, a medium semi-skilled job. (R. at 57.)

The ALJ proposed a hypothetical regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 57–58.) Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could not perform her past relevant work, but could perform approximately 180,000 unskilled, light jobs in the national economy such as a mail clerk, hand packager, and garment folder. (R. at 58.) The VE also testified that if the hypothetical individual would be off tasks 10% of the workday, due to headaches, bathroom breaks, pain issues or psychological symptoms, it would be work preclusive. (R. at 59.)

### III. RELEVANT MEDICAL RECORDS

#### A. Right Ankle Impairments

A notation in a March 2016 MRI report noted that Plaintiff alleged that she began experiencing pain in her right ankle around September 2015. (R. at 1016.) In December 2015, ankle x-rays revealed "no acute fracture or dislocation" of the ankle, but suggested calcaneonavicular coalition. (R. at 1324.)

1. **David M. Vaziri, M.D.**

In February 2016, Plaintiff consulted with orthopedic surgeon, Dr. Vaziri, due to right ankle pain which she described "waxe[d] and wane[d] in severity." (R. at 1010.) On examination, Dr. Vaziri found tenderness and swelling, diminished range of motion due to pain, diminished strength due to pain, and crepitus and catching. He assessed a lateral ligament sprain. (R. at 1012.) Dr. Vaziri ordered an MRI which showed a grade one sprain of Plaintiff's anterior talofibular ligament, with trace tibiotalar and subtalar joint effusions. (R. at 1017–18.) When seen for follow up, Plaintiff agreed to proceed with surgical intervention to treat the ligament tear. (R. at 1020.)

Dr. Vaziri performed the right ankle arthroscopy with extensive debridement of synovitis and chondromalacia, right ankle lateral ligamentous repair (Brostrom procedure), right ankle distal fibular exostectomy, and right ankle peroneal tendon tenosynovectomy in April 2016. (R. at 1024–25.)

Plaintiff treated with Dr. Vaziri for post-operative visits from April to August 2016, reporting "no unusual complaints." Dr. Vaziri reported improved range of motion and intact ankle strength. (R. at 1026–45.)

2. **Sarah Abshier, D.P.M.**

In November 2016, Plaintiff consulted with podiatrist, Dr. Abshier, complaining of ankle pain and ulceration at her incision site. Dr. Abshier debrided the wound, cauterized the tissue and treated the infection. (R. at 1235–37.)

3. **Stephen J. Voto, M.D.**

Plaintiff consulted with orthopedic surgeon, Dr. Voto, in May 2017, complaining of constant pain, weakness, pain at her incision, pain with range of motion, and stiffness at her right ankle. (R. at 995.) Dr. Voto believed she had an instability type procedure performed. Plaintiff rated her pain severity at a level of 4 on a 0-10 visual analog scale. On examination, her right ankle showed visible swelling of the lateral structures and instability. (*Id.*) Dr. Voto assessed instability in the ankle. An MRI of the right ankle in May 2017 showed thickening of the anterior talofibular ligament likely reflecting remote injury, chronic appearing split tear of the juxta malleolar peroneus brevis tendon, mild tenosynovitis of the posterior tibialis tendon, and trace tibiotalar and subtalar joint effusions. (R. at 1000.)

Dr. Voto performed an ankle reconstruction in June 2017. (R. at 997–98.) Six weeks after the surgery, on July 26, 2017, Plaintiff demonstrated no pain or discomfort in her ankle, and Dr. Voto noted that she was able to bear weight. (R. at 991.)

When seen for follow up on August 9, 2017, Dr. Voto noted Plaintiff's right ankle was tight, but "[e]verything looks good and I'm very happy with the results." (R. at 989.) He set Plaintiff up for physical therapy to address her tight iliotibial band. (*Id.*)

Plaintiff completed physical therapy in August and September 2017. (R. at 1122–33.) At her sixth appointment, she stated that her ankle was not bothering her, with her level at 0/10, and her flexibility was good. She requested to be discharged from physical therapy. (R. at 1122.)

Plaintiff saw Dr. Voto for an 11th week post-operative visit on September 6, 2017. Plaintiff demonstrated a stable ankle on examination and Dr. Voto recommended discharge from

care. (R. at 987.) Plaintiff returned on September 13, 2017, complaining of numbness in her ankle. On examination, Dr. Voto observed a "full range of motion, good stability, [and] no evidence of motor dysfunction" and no specific numbness in the ankle. He noted that sensory numbness distal to the incision was normal and recommended no treatment beyond observation. (R. at 985.)

## B.  Gynecological and Genitourinary Impairments

### 1.  Brittney Valentine, CRNP

On November 26, 2013, Plaintiff saw her primary care provider, Ms. Valentine, complaining of diarrhea and vaginal itching. (R. at 346.) Following examination, Ms. Valentine assessed right shoulder pain, impetigo, vaginal yeast infection, and gastritis. Plaintiff was treated with medication. (R. at 347.)

### 2.  William H. Batten, M.D.

Plaintiff treated with a urologist, Dr. Batten, for cystitis and recurrent urinary tract infections from May 2014 through April 2015. (R. at 403–24.) During that time Plaintiff was seen for acute cystitis, experiencing a burning sensation when urinating and pelvic/rectal pain. (*Id.*) Dr. Batten assessed chronic cystitis and treated Plaintiff with antibiotics. (*Id.*) By April 2015, Plaintiff reported painful urination, but Dr. Batten observed "good results" and improvement in Plaintiff's symptoms from the antibiotics. (R. at 403.)

### 3.  Fairfield Community Health Center

Plaintiff was seen by nurse practitioner, Sheri Dodds, CNP in June 2015 to treat dyspareunia. (R. at 568.) On examination, Ms. Dodds found a tender bladder but no suprapubic tenderness. Plaintiff's examination was otherwise normal. (R. at 571–72.) Ms. Dodds ordered

urine cultures and a pelvic ultrasound. (*Id.*) When seen for follow-up, Plaintiff complained of painful urination, but her pelvic ultrasound and urine cultures were normal. Ms. Dodds referred Plaintiff to Dr. Book. (R. at 561–66.)

    4.        **Nicole Book, M.D.**

In September 2015, Plaintiff consulted with an urogynecologist, Dr. Book, for painful intercourse, supra pubic pain, dysuria and frequent urinary tract infections. (R. at 822–23.) On examination, Dr. Book noted bladder base tenderness with no other pain and no lesions on the genitalia. (R. at 824–25.)

During October and November 2015, Plaintiff underwent a series of six bladder instillations. (R. at 828, 831, 834, 837, 839, 841.) Although Plaintiff complained of perineal "rawness and burning" after the fourth instillation, at her last treatment, Dr. Book found that the perineal irritation was visually normal. (R. at 839, 841.) Following her fifth instillation, Plaintiff reported "a complete improvement in suprapubic discomfort, urinary urgency, and dysuria." (R. at 841.)

In March 2016, Plaintiff returned to Dr. Book reporting that, nine weeks prior, she underwent bilateral laparoscopic salpingectomy for sterilization with Dr. Miller. Two weeks later she was diagnosed with a UTI and treated with a 10-day course of Bactrim through her primary care provider. She then redeveloped pain in her bladder with a flare in her pelvic pain. Plaintiff underwent two bladder instillations, in which she reported relief. (R. at 1092–93.)

In June 2017, Plaintiff underwent a cystoscopy with hydrodistension under the diagnoses of pelvic pain, urinary frequency, and vulvar lesion. (R. at 1095–96.) When seen for follow-up in July, Dr. Book noted Plaintiff had 60-70% improvement in her discomfort. She was trying

hard to avoid voiding, noting she had an urgency approximately every fifteen minutes but could delay for upwards of an hour to an hour and a half. She stated she still had some burning with urination and a large amount of pain with intercourse, noting "it feels like somebody dumped acid inside." (R. at 1097.) Plaintiff had suprapubic discomfort as well. The doctor noted that she continued to be very bothered by her documented genuine stress urinary incontinence. (*Id.*) Dr. Book also noted that Plaintiff has been working with her multiple physicians to try to decrease her heavy medical load; at that time, she was utilizing 17 medications per day. (R. at 1097–98.)

        5.        **Yelena Feldman, D.O./ Steven Miller, D.O.**

Plaintiff consulted with gynecologist, Dr. Feldman, in December 2015 to discuss a tubal ligation for sterilization. On examination, Dr. Feldman found Plaintiff's vulva was tender to palpation, but her urethra, vagina, cervix, uterus, and perineum were normal. (R. at 1683–84.) Plaintiff's fallopian tubes were surgically removed in January 2016. (R. at 1677.)

Plaintiff was seen by another gynecologist, Dr. Miller, for post-op follow-up who noted that Plaintiff was doing well and without complaints. (*Id.*) Dr. Miller also prescribed medication to treat Plaintiff's vulvar irritation. (R. at 1678.)

In May 2016, Plaintiff returned to Dr. Miller for an evaluation of her chronic vulvitis, and she reported that her pain, burning, and itching had resolved. (R. at 1672.) By December 2016, Dr. Miller found mild erythema in Plaintiff's external genitalia and excoriation in the lower part of her vulva. At that time, Plaintiff also reported that she experienced a worsening of her chronic vulvitis during menstruation. (R. at 1670.)

Plaintiff returned in February 2017 to re-discuss surgery to address breakthrough bleeding and chronic vulvitis. (R. at 1655, 1662.) At that time, Plaintiff elected to undergo an endometrial ablation, which was performed in March 2017. (R. at 1653.)

In April 2017, Plaintiff reported a "marked improvement of the inflammation involving the . . . lower vulvar area since surgery." She also complained of pain following intercourse and several recurrent fissures. On examination, Dr. Miller found external genitalia without gross lesions, a prior area of erythema or excoriation, and improvement in the perineum. He prescribed testosterone cream to treat her symptoms. (R. at 1647–51.)

By July 2017, Plaintiff stated that she had some relief following the endometrial ablation, but noticed recurrent breakthrough bleeding, spotting, pelvic cramping and dysmenorrhea. On examination, Dr. Miller found Plaintiff's external genitalia demonstrated chronic inflammation with suspected vulvar dystrophy and small areas of skin fissure. They discussed options including conservative management, hormonal manipulation and surgical options. Plaintiff elected to proceed with a hysterectomy. (R. at 1636–39.)

Plaintiff underwent a hysterectomy in August 2017. (R. at 1633.) In follow-up, Dr. Miller reported that Plaintiff was healing well without complaints. At that time, Plaintiff denied any vaginal bleeding, vaginal discharge, dysuria, or hematuria. Dr. Miller also reported that Plaintiff exhibited "marked improvement" of prior excoriation on her vulva and no erythema. (R. at 1630.)

**C.  State Agency Review**

In July 2015, after review of Plaintiff's medical record, Lynne Torello, M.D., opined that, based on the medically determinable impairments of degenerative disc disease, interstitial

cystitis, thyroid disorder, and major joint dysfunction, Plaintiff could lift twenty pounds frequently and ten pounds occasionally; stand/walk for about six hours out of eight and sit for six hours out of eight. (R. at 73, 75.) Dr. Torello also found that Plaintiff was unlimited in climbing ramps/stairs, balancing and stopping; occasionally limited in kneeling; frequently limited in crouching, but she could never climb ladders/ropes/scaffolds or crawl. (R. at 75–76.) Dr. Torello based Plaintiff's postural limitations on her degenerative disc disease of her c-spine, neck and right shoulder pain, and decreased range of motion. (R. at 76.) Dr. Torello also found that Plaintiff was limited to no overhead reaching with her right upper extremity due to pain and reduced range of motion. (*Id.*)

In December 2015, Esberdado Villanueva, M.D., reviewed the record upon reconsideration and affirmed Dr. Torello's assessment. (R. at 113–18.)

## IV. THE ADMINISTRATIVE DECISION

On May 30, 2018, the ALJ issued his decision. (R. at 10–22.) Plaintiff met the insured status requirements through September 30, 2018. At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful activity since

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

10

April 2, 2015, the alleged onset date. (R. at 13.) The ALJ found that Plaintiff has the following severe impairments: cervical degenerative disc disease; irritable bowel syndrome (IBS); gastroesophageal reflux disease (GERD); headaches; dysthymic disorder and generalized anxiety disorder. (*Id.*) The ALJ determined that Plaintiff's asthma, iliotibial band syndrome, right leg, hypothyroidism, tachycardia, mild hearing loss and hypersomnia are non-severe impairments because they cause only minimal or less than minimal limitation in Plaintiff's ability to perform basic work activities. (*Id.*) In addition, the ALJ determined that "the record otherwise documents conservative treatment for relatively minor, nonrecurring, or resolved complaints and conditions, or complaints not supported by objective findings, such as right patella chondromalacia, an ankle ligament strain, and genitourinary and gynecological issues." (R. at 14.)

He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ assessed the severity of Plaintiff's impairments by comparing the medical evidence to the requirements of the following listings: 1.00, musculoskeletal system; 5.00, digestive system; and 12.00, mental disorders. (R. at 14–16.)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except pushing/pulling limited to occasional on the

---

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

11

right; never climbing ladders, ropes or scaffolds; occasional kneeling; frequent crouching; never crawling; reaching with the right upper extremity limited to frequent (forward and laterally), but no overhead reaching on the right; no reaching limitations on the left; handling with the right limited to frequent; must be allowed to rest during break times; goal based production work measured by end result, not pace work; simple, routine and repetitive tasks; work allowed off task five percent of the day; work in a low stress job defined as only occasional changes in the work setting and interaction with coworkers, supervisors and the public is limited to occasional.

(R. at 16.) In making the above determination, the ALJ noted, "[i]n spite of the [Plaintiff's] extensive alleged symptomatology, there is no medical opinion of record by treating or examining practitioners to indicate that she is prevented from all work activity or more limited than assessed above." (R. at 19.) The ALJ assigned partial weight to the assessments from the state agency reviewing physicians, Drs. Torello and Villanueva, finding their opinions were consistent with the record, but also that evidence received at the hearing level supports additional limits with respect to postural and reaching limitations. (R. at 20.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff is unable to perform her past relevant work, but that she can perform jobs that exist in significant numbers in the national economy. (R. at 20–22.) He therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 22.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if

12

supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

In her Statement of Errors, Plaintiff maintains that the ALJ should have considered her right ankle impairment and genitourinary impairment as severe and should have included

corresponding limitations in her RFC with respect to these two impairments. (ECF No. 12 at 25–34).

The United States Court of Appeals for the Sixth Circuit has described step two of the sequential process as follows:

> At step two, an ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." [20 C.F.R. §§ 404.1520a(a) and 404.1520a(b)(1)]. If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id*. at §§ 404.1520a(b)(2), (c)(3). These four functional areas are commonly known as the "B criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 *et seq*.; *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using the following four-point scale: none, one or two, three, four or more. *Id*. If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. Id. at § 404.1520a(d)(1). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *See id*. § 404.1520a(d)(2).

*Rabbers*, 582 F.3d at 652–53. Thus, if no signs or laboratory findings substantiate the existence of an impairment, it is appropriate to terminate the disability analysis. *See* SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996) ("In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920 . . . ."). Furthermore, in the Sixth Circuit, "the step two severity regulation codified at 20 C.F.R. §§ 404.1520(c) and 404.1521 has been construed as a *de minimis*

hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

Where the ALJ determines that a claimant has a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803, (6th Cir. 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(e); *see also White v. Comm'r of Soc. Sec.*, 312 F. App'x. 779, 787 (6th Cir. 2009) (holding that, "[o]nce one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe"). If an ALJ considers the limiting effects of both severe and non-severe impairments in determining a claimant's RFC, any error in failing to find a particular impairment severe is harmless. *White*, 312 F. App'x. at 787. In other words, if an ALJ errs by not including a particular impairment as an additional severe impairment in step two of his analysis, the error is harmless as long as the ALJ found at least one severe impairment, continued the sequential analysis, and ultimately addressed all of the claimant's impairments in determining the residual functional capacity. *See Swartz v. Barnhart*, 188 F. App'x 361, 368, 2006 WL 1972086 (6th Cir. 2006) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

"[T]o the extent an ALJ determines that an identified impairment, severe or non-severe, does not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'" *McQuown v. Comm'r of Soc. Sec.*, No. 3:18-CV-32, 2019 WL

2476803, at *6 (S.D. Ohio June 13, 2019) (citing *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, at *6 (E.D. Mich. Feb. 27, 2015); *see also* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). Failure to state the basis for including no limitations arising from non-severe impairments is error. *See Meadows v. Comm'r of Soc. Sec.*, No. 1:07cv1010, 2008 WL 4911243, at *13 (S.D. Ohio Nov. 13, 2008).

Here, the ALJ included no limitations in his RFC determination arising from either Plaintiff's right ankle impairment or her genitourinary impairment. Instead, the only mention of these impairments is in step two of the sequential process, where the ALJ determined the impairments to not be severe. In so determining, the ALJ stated as follows:

> The record fails to document other severe impairments. Rather, the record otherwise documents conservative treatment for relatively minor, nonrecurring, or resolved complaints and conditions, or complaints not supported by objective findings, such as right patella chondromalacia, an ankle ligament strain, and genitourinary and gynecological issues (*see e.g.* Exhibits 7F; 18F; 20F; 23F; 30F).

(R. at 14.) The ALJ went on to determine Plaintiff's RFC as follows:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except pushing/pulling limited to occasional on the right; never climbing ladders, ropes or scaffolds; occasional kneeling; frequent crouching; never crawling; reaching with the right upper extremity limited to frequent (forward and laterally), but no overhead reaching on the right; no reaching lin1itations on the left; handling with the right limited to frequent; must be allowed to rest during break times; goal based production work measured by end result, not pace work; simple, routine and repetitive tasks; work allowed off task five percent of the day; work in a low stress job defined as only occasional changes in the work setting and interaction with coworkers, supervisors and the public is limited to occasional.

(R. at 16.)

The ALJ devoted more than four pages of his decision to explain the record evidence in support of his RFC finding, but nowhere in that analysis does he refer to Plaintiff's right ankle impairment or genitourinary impairment. (*See* R. at 16–20.) The Commissioner argues *post hac* that the medical record supports the ALJ's conclusion that no RFC limitations were warranted by Plaintiff's right ankle and genitourinary impairments and that the ALJ cited this evidence at step two in his determination of whether the impairments were severe. (ECF No. 18 at 12–14.)

The Undersigned finds no merit to the Commissioner's analysis in this regard. This argument conflates the distinct steps of the sequential review process and fails to reasonably explain the absence of an analysis of Plaintiff's right ankle and genitourinary impairments. *See Romig v. Astrue*, No. 1:12-cv-1552, 2013 WL 1124669, at *6 (N.D. Ohio Mar. 18, 2013) (stating that "it is the opinion given by an administrative agency rather than counsel's 'post hoc rationale' that is under the Court's consideration"). Again, insofar as the ALJ found no limitation arising from these impairments, he was required to so state and explain his reasoning. *McQuown*, 2019 WL 2476803, at *6.

The Court cannot infer from a silent record that the ALJ considered these impairments in rendering his RFC finding. The Court finds that the ALJ's failure to fully consider Plaintiff's right ankle and genitourinary impairments in determining plaintiff's RFC is not harmless error and requires this case to be reversed and remanded for further development and clarification of the effect of these impairments on her ability to work. For these reasons, it is **RECOMMENDED** that Plaintiff's first and second contentions of error be **SUSTAINED**.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence does not support the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and the ALJ for further consideration consistent with this Report and Recommendation.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: February 14, 2020                                /s/ *Elizabeth A. Preston Deavers*
                                                                        Elizabeth A. Preston Deavers
                                                                        Chief United States Magistrate Judge